COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| CALLON (PERMIAN) LLC and CALLON PETROLEUM OPERATING COMPANY, | § | No. 08-24-00043-CV |
| | § | Appeal from the |
| Appellants, | | |
| | § | 143rd Judicial District Court |
| v. | | |
| | § | of Reeves County, Texas |
| KWF ENTERPRISES, LP, HED ENTERPRISES, LP, EXILE ROYALTY COMPANY, LLC, MICHAEL A. KULENGUSKI, CAROL A. NOONAN, AARON CHILDRESS, and HUNTER G. DAVIS, | § | (TC# 21-01-23866-CVR) |
| | § | |
| | § | |
| | § | |
| Appellees. | § | |

## MEMORANDUM OPINION

Appellants Callon (Permian) LLC, formerly known as Carrizo (Permian) LLC, and Callon Petroleum Operating Company (collectively, Callon) have an ownership interest in certain oil and gas leases in Reeves County. Callon's ownership interest is subject to overriding royalty interests held by Appellees KWF Enterprises, LP; HED Enterprises, LP; Exile Royalty Company, LLC; Michael A. Kulenguski; Carol A. Noonan; Aaron Childress; and Hunter G. Davis (collectively, KWF).

The 24 leases involved in this case were among hundreds of leases included in a series of sales transactions between seller KEW Drilling (KEW) and buyers ExL Petroleum Management, LLC (ExL), Silverback Exploration, LLC (Silverback), and Arris Delaware Basin, LLC (Arris). ExL is Callon's predecessor. KEW owned a 75% interest in the vast majority of the hundreds of

leases it was selling, but owned an extra up-to-5% interest (i.e., a total interest of up to 80%) in the 24 leases at issue in the appeal before us. The sales contracts provided that, before closing, KEW "may" assign its interest above 75% in these 24 leases to its key personnel or affiliates in the form of an overriding royalty interest.[1]

The original such overriding royalty assignments, executed by KEW before the sales transactions closed, conveyed to KEW's affiliate, KWF, only 65% (rather than 100%) of the extra up-to-5% interest owned by KEW. After the sales transactions closed—and after Callon acquired its ownership interest in the 24 leases at issue from ExL—KEW executed corrected overriding royalty interest assignments. The only parties to these corrected assignments were the assignor, KEW, and its assignee, KWF. The corrected assignments replaced "65%" with "100%," stating that the original assignments were the product of "scrivener's error and inadvertence." If valid, the corrected assignments reduce Callon's ownership interest in the leases at issue.

Callon and KWF filed opposing summary judgment motions seeking a ruling on whether the corrected assignments are enforceable by KWF against Callon. The trial court ruled in KWF's favor, concluding that the corrected assignments are enforceable. We reverse, concluding that the corrected assignments are not enforceable against Callon.

## I. BACKGROUND

### A. Factual background

KEW sold the 24 oil and gas leases at issue in a series of transactions involving hundreds of leases, thousands of acres of land, three buyers—ExL, Silverback, and Arris—and seven closings.[2] The three sales contracts were all signed in 2015, and the seven closings all occurred

---

[1] An overriding royalty interest is a "percentage . . . carved from the working interest." *Chesapeake Expl., L.L.C. v. Hyder*, 483 S.W.3d 870, 872–73 (Tex. 2016). It is a non-participating interest, i.e., its owner has no right to go on the property and drill. *Ridge Oil Co., Inc. v. Guinn Investments, Inc.*, 148 S.W.3d 143, 155 (Tex. 2004).

[2] The parties agree that the relevant sales contracts are materially identical.

between June 2015 and approximately February 2016.[3] As alluded to above, the distinguishing feature of the leases at issue is that, while the lessor's royalty in all the other leases is 25%, the lessor's royalty in these 24 leases is between 20 and 25%, meaning that while KEW held a 75% interest in the other leases, its interest in the leases at issue was between 75 and 80%.

To address KEW's up-to-5% additional interest in the leases at issue, the sales contracts included the following "covenants and agreements" section, which provides that KEW "may" assign this additional interest to certain parties, provided that "after giving effect to such assignments, the Designated NRI is satisfied":

> **8.1 Covenants and Agreements of [KEW].** [KEW] covenants and agrees with Buyer that, from the date of execution hereof until the Closing Date, [KEW] shall not, without the written consent of the Buyer . . . (iii) sell, transfer, assign, convey or otherwise dispose of any of the Leases, or any interest therein; provided, however, that prior to the Closing Date [KEW] may assign overriding royalty interests in the Leases to certain key personnel of [KEW] (or their Affiliates), provided that after giving effect to such assignments, the Designated NRI is satisfied with respect to the [l]eases covered by such assignments, such assignments of overriding royalty to be in the form of Exhibit B . . . .

The sales contracts define "Designated NRI" as "an NRI of 75%," and define "NRI" or "Net Revenue Interest" as "the interest in and to all applicable production of Hydrocarbons produced, saved and sold under and pursuant to [the leases being conveyed]."

Exhibit B to the sales contracts, entitled "Form of Assignment of Overriding Royalty Interest," addresses KEW's interest, if any, in excess of 75%, stating that KEW:

> . . . does hereby SELL, ASSIGN, and CONVEY in the proportions set forth below opposite the name of each Assignee, an overriding royalty interest in and to all oil, gas and other liquid or vaporous hydrocarbons . . . sold from each of the oil and gas leases . . . described in the attached Exhibit "A", equal to, the positive difference, if any, between all presently existing burdens against each of the Leases and twenty five percent (25%) of the oil, gas and other liquid or vaporous hydrocarbons . . . sold.

---

[3] The date of the seventh closing is not clear from the record, which does not appear to include any documents from this final closing between KEW and Arris.

3

Below this language, Exhibit B contains the following fill-in-the-blank section:

| Names and Addresses of Assignees | Percentage Interests Assigned to Assignees |
|---|---|
| | |
| TOTAL | 100% |

The fill-in-the-blank sections in the original executed versions of Exhibit B, signed before the corresponding contract closing dates, i.e., by early 2016, were completed as follows:

| Names and Addresses of Assignees | Percentage Interests Assigned to Assignees |
|---|---|
| KWF Enterprises, L.P. 4925 Greenville Ave., Suite 500 Dallas, Texas 75206 | 32.50% |
| HED Enterprises, L.P. 4925 Greenville Ave., Suite 500 Dallas, Texas 75206 | 32.50% |
| TOTAL | 65% |

Because these original assignments conveyed 65% of the up-to-5% extra interest KEW held in the 24 leases at issue, KWF received an up-to-3.25% overriding royalty interest in each lease (i.e., 65% of the up-to-5% KEW "may" have assigned), while the buyer received the Designated NRI of 75% plus an additional up to 1.75% (i.e., the unassigned 35% of the up-to-5% KEW "may" have assigned).[4]

Callon acquired and recorded its ownership interest in the leases at issue in August 2017. In November 2017, KEW and its assignees executed and recorded seven instruments entitled "Amend[]ment to and Correction of Assignment of Overriding Royalty Interest."

These corrected assignments state that "by scrivener's error and inadvertence," the original

_____

[4] In contrast, had the original assignments conveyed 100% of the up-to-5% extra interest KEW held, KWF would simply have received an up-to-5% overriding royalty interest in each lease, and the buyer simply the 75% Designated NRI.

assignments "incorrectly state[d] the percentage interests in the overriding royalty interest . . . intended to be conveyed," and "it is the mutual desire of Assignor and Assignees to amend and correct [them]." Each corrected assignment then provides that for good and valuable consideration, KEW and its assignees agree that the original amendment "is amended and corrected by deleting the percentage interests . . . purported to be conveyed . . . and replacing such percentage interests with the following," i.e., a new fill-in-the-blank section:

| Names and Addresses of Assignees | Percentage Interests Assigned to Assignees |
|---|---|
| KWF Enterprises, L.P. 4925 Greenville Avenue, Suite 500 Dallas, Texas 75206 | 50.00% |
| HED Enterprises, L.P. 4925 Greenville Avenue, Suite 500 Dallas, Texas 75206 | 50.00% |
| TOTAL | 100.00% |

## B. Procedural background

In 2021, KWF sued Callon, seeking to quiet title in its royalty interests and recover unpaid royalties and money-had-and-received. KWF later amended its pleading to add claims for breach of contract and declaratory judgment, and subsequently filed a supplemental pleading alleging certain costs were being improperly charged against its royalties.

In 2022, Callon and KWF filed opposing traditional summary judgment motions seeking a ruling on whether the corrected assignments are enforceable against Callon, who asserts bona fide purchaser status. The trial court ruled in KWF's favor. After severing the supplemental improper costs claim, the trial court entered a final judgment decreeing that the corrected assignments are valid, binding, and enforceable against Callon. The final judgment further awarded KWF attorney's fees in the amount of $60,636, another $25,000 if Callon is unsuccessful on appeal to this Court, and another $12,500 if Callon is unsuccessful on appeal to the Texas Supreme Court.

5

This appeal followed.

## II. ISSUES ON APPEAL

Callon raises two issues on appeal, arguing the trial court erred by (1) concluding that Callon is not a bona fide purchaser protected against the changes made in the corrected assignments, and (2) sustaining KWF's objections to two paragraphs in an affidavit by William B. Burford, an expert witness. However, prior to addressing the parties' arguments as to whether Callon may have been a bona fide purchaser, we must construe the sales contract language to determine whether it *required* the assignment of 100% of the up-to-5% overriding royalty interest.

## III. STANDARD OF REVIEW

We review summary judgments de novo. *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 804 (Tex. 2023). A traditional summary-judgment movant must establish both that no issue of material fact exists and that it is entitled to judgment as a matter of law. *Id*. In reviewing a trial court's order granting summary judgment, we generally take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *Concho Res., Inc. v. Ellison*, 627 S.W.3d 226, 233 (Tex. 2021). When cross-motions for summary judgment are filed on an issue and the trial court grants one motion and denies the other, we "review the summary-judgment evidence and render judgment that the trial court should have rendered." *Point Energy*, 669 S.W.3d at 804.

We similarly review contract language de novo. *Id*. A contract that has a "certain and definite meaning" is unambiguous and construed as a matter of law; but if it is amenable to more than one reasonable construction, summary judgment is improper. *Id*. (citing *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022)).

6

## IV. DISCUSSION

Standard rules of contract construction govern oil and gas contracts, although special rules may also apply because real property interests are involved. *Point Energy*, 669 S.W.3d at 804. Consistent with the "strong public policy favoring freedom of contract," parties to a contract are generally free to select its terms, and those terms define their rights and duties. *Id.* (citing *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018)). We "respect and enforce" these terms by ascertaining the parties' intent as expressed within the contract's four corners. *Id.* at 804–05 (citing *Discovery Operating*, 554 S.W.3d at 595). Our analysis begins with the express language of the contract. *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019). Further, we "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id*. (citing *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006)). In addition, we "give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Id*. (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

### A. Whether the contracts conveyed to the buyers "exactly" 75% NRI

KWF argues that three provisions of the sales contracts, if considered together, show that the contracts were intended to convey to the buyers an NRI of "exactly" 75%, and that 100% of the up-to-5% additional interest held by KEW in the leases at issue was required to be conveyed as overriding royalty interests to KEW's chosen assignees.

First, KWF points to the term "Designated NRI," which is defined as "an NRI of 75%," and not "at least" 75% or anything other than "[e]xactly 75%."

Second, KWF points to Sections 3.2B and 5.4B, which provide for a downward adjustment

7

of the total purchase price if a title defect in a particular lease results in "an actual reduction in NRI below the Designated NRI [of 75%]" for that lease.

Third, noting that no similar section provides an upward adjustment for any leases in which KEW had an interest exceeding the Designated NRI of 75%, KWF argues that this discrepancy is explained by Section 8.1. Under Sections 8.1(i)–(ii) and (iv–vi), KEW agreed not to do various things (e.g., abandon, modify, or encumber any leases being conveyed) to ensure that the buyers received exactly 75% NRI overall. As a result, KEW reasons, Section 8.1(iii) must likewise be interpreted to ensure that the buyers received an NRI of exactly 75%.

As noted above, Section 8.1(iii) addresses KEW's up-to-5% additional interest in the leases at issue, providing that KEW "may" assign this additional interest to certain parties before closing on the sales contracts, provided that "after giving effect to such assignments, the Designated NRI is satisfied":

> . . . prior to the Closing Date [KEW] may assign overriding royalty interests . . . to certain key personnel of [KEW] (or their Affiliates), provided that after giving effect to such assignments, the Designated NRI is satisfied with respect to the [l]eases covered by such assignments, such assignments of overriding royalty to be in the form of Exhibit B.

Callon does not dispute that the contract's definition of Designated NRI, together with its downward and upward adjustment provisions, including Section 8.1(iii), *could* result in conveyance of exactly 75% NRI to the buyer. Rather, Callon disputes that the contract *requires* such a result. That is, in Callon's view, Section 8.1(iii) merely *permitted* KEW to convey the entirety of its up-to-5% additional interest in the leases at issue. Put differently, Callon views Section 8.1(iii) as setting forth an option to assign this additional interest, one which expires if not timely exercised. In contrast, KWF views Section 8.1(iii) as setting forth a mandatory act, one which, if not taken, constitutes a correctable mistake. Thus, the crux of this case is whether an assignment under Section 8.1(iii) involves a permissive or mandatory act, which we address next.

8

## B. Whether Section 8.1(iii) assignments were permissive or mandatory

### (1) The immediate context of Section 8.1

Callon argues that assignments under Section 8.1(iii) are permissive, pointing to the provision's use of the word "may" rather than "shall" or "must" : ". . . prior to the Closing Date [KEW] *may* assign overriding royalty interests . . ." (emphasis added). In support of its position, Callon cites cases "recogniz[ing] in many contexts that the word 'may' is 'permissive,'" including *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 525 (Tex. 2015) (finding "no basis on which to conclude that the parties intended the word 'may' to be mandatory rather than permissive"); *Iliff v. Iliff*, 339 S.W.3d 74, 81 (Tex. 2011) (stating that the word "may" is "permissive" and "imports the exercise of discretion"); and *Dallas Cnty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 874 (Tex. 2005) ("The words 'may' and 'shall' mean different things, and . . . [t]he context in this case does not require an interpretation of the permissive word 'may' to mean something other than its plain meaning.").

KWF, in turn, cites no cases in which "may" was held to mean "shall." However, KWF does endeavor to distinguish the cases cited by Callon. First, KWF notes that *Iliff* and *Bolton* involved the use of "may" in statutory contexts, making the analysis in these cases subject to the Code Construction Act. However, KWF does not argue that an analysis based on the plain meaning of "may" would be different.

Second, KWF argues that while *Leach* involved the use of "may" in a contract provision, the provision there, unlike Section 8.1, did not juxtapose "may" with "shall not." Such a juxtaposition, KWF contends, suggests that "may" was intended to mean "shall":

> The immediate context of the word "may" in Section 8.1(iii) does not indicate that the assignment of [overriding royalty interest] provision was merely optional or permissive. Juxtaposed with actions that KEW "shall not" do (drill wells, abandon or modify Leases, or encumber any Leases), this provision shows not that KEW *might or might not* assign the [overriding royalty interests] to its key personnel.

Instead, it shows that KEW *will* assign the [overriding interests] to them, and thus *when KEW chooses to act*, the action is authorized for the express purpose that the "the Designated NRI is satisfied." (emphasis in original).

However, KWF cites no authority that the use of "may" and "shall not" in close proximity suggests both terms are mandatory (i.e., that the former is prescriptive and the latter proscriptive). Further, KWF advances no reason why construing "may" and "shall not" in accordance with their plain meanings—i.e., as permissive and mandatory, respectively[5]—would lead to an absurd or improbable result here. Moreover, construing "may" as mandatory in Section 8.1(iii), as urged by KWF, *would* yield an arguably peculiar result—KEW's assigning of overriding royalty interests implicates a benefit for itself and its chosen assignees, but not for the buyer. KWF suggests no reason why a contract might *require* a party to do anything solely for its own benefit.

### (2)    The "total context" of the contract

KWF argues that the "total context" of the contract shows that Callon's construction of Section 8.1(iii)—i.e., that it creates an option, not an obligation—is untenable: "Since the Contracts need to be interpreted as a whole, every provision needs to be considered when determining what the word 'may' means in Section 8.1(iii). Here, the entirety of the Contracts shows that the intent was to provide the buyers with exactly the Designated NRI of 75%." However, the only contract provisions outside of Section 8.1 that KWF mentions are the ones discussed above: the definition of "Designated NRI," and Sections 3.2B and 5.4B, which provide for a downward adjustment of the total contract price for certain title defects. We do not agree that

---

[5] *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 525 (Tex. 2015); *Iliff v. Iliff*, 339 S.W.3d 74, 81 (Tex. 2011); *Dallas Cnty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 874 (Tex. 2005); *see also, e.g., In re B.M.B.*, No. 05-22-01322-CV, 2023 WL 3836429, at *8 (Tex. App.—Dallas June 6, 2023, pet. denied) (mem. op.) ("The plain meaning of 'may' is to 'have permission to' or to 'be free to.'") (citing Webster's Ninth New Collegiate Dictionary (1985)); *Town of Annetta S. v. Seadrift Dev., L.P.*, 446 S.W.3d 823, 829 (Tex. App.—Fort Worth 2014, pet. denied) ("The plain meaning of 'shall not' imposes a prohibition.") (citing *Fuentes v. Howard*, 423 S.W.2d 420, 423 (Tex. Civ. App.—El Paso 1967, writ dism'd)).

.

these provisions show the intent of the contract was to "provide the buyers with exactly the Designated NRI of 75%."

Section 3.2B provides that "[t]he Purchase Price shall be adjusted downward by . . . the amount of the aggregate Defect Values in accordance with Section 5.4." In turn, Section 5.4B provides that Defect Values are calculated differently for excluded and included leases:

> If the Title Defect is an actual reduction in NRI below the Designated NRI for such Lease, and if Buyer, in accordance with Section 5.6 has elected to exclude the affected Lease, the Defect Value shall be the Allocated Value for the affected Lease. If Buyer has not elected to exclude the affected Lease, then the Defect Value shall be the Allocated Value for the affected Lease, multiplied by a fraction (i) the numerator of which is difference between the Designated NRI and the actual NRI for such Lease, and (ii) the denominator of which is the Designated NRI for such Lease . . . .

However, to secure the benefit of a downward adjustment under Sections 3.2B and 5.4B, the buyer must timely notify the seller of any alleged defect under Section 5.5, otherwise the defect is waived:

> On or before 5:00 p.m. Central Time, five (5) Business Days prior to each Closing Date (the "Defect Notice Date"), Buyer shall deliver to Seller a written notice of Title Defects describing in reasonable detail on a Lease-by-Lease basis (i) the Title Defect, (ii) the basis of the Title Defect and (iii) Buyer's good faith estimate of the Defect Value caused by the Title Defect ("Title Defect Value"). The failure of Buyer to timely notify Seller of a Title Defect or the Title Defect Value thereof on the Defect Notice Date shall be deemed a waiver by Buyer of such Title Defect, other than Title Defects arising from a breach of the Special Warranty contained in the Assignment and Conveyance (unless Buyer had knowledge thereof prior to the Defect Notice Date).

Thus, with respect to any lease containing a title defect that diminishes its value, the operation of Section 3.2B yields a transfer of exactly 75% NRI overall only if the buyer takes action to preserve its interest by timely notifying the seller. Likewise, with respect to any lease in which the seller holds an interest in excess of 75%, the operation of Section 8.1(iii)—construing "may" as permissive in accordance with its plain meaning—yields a transfer of exactly 75% NRI overall only if the seller takes action to preserve its interest by timely assigning overriding royalties

11

to its chosen assignees. We believe this symmetry between Sections 3.2B and 8.1(iii) is instructive and supports Callon's construction of the contract. Neither provision accords either party a right to correct mistakes after the fact, but instead requires each party to take timely action to ensure the conveyance of 75% NRI overall. We conclude that the contract does not allow or require post-closing "correction" or "amendment" of KEW's timely assignment of 65% of the additional up-to-5% interest it held in the 24 leases at issue.

### (3)   The effect of Exhibit B

Finally, KWF argues that inclusion of the entirety of Exhibit B as part of the contract is critical to the contract's construction, contending that Exhibit B can be reconciled with the Designated NRI of 75% and Section 8.1(iii) only by the exhibit "being indicative of how the Designated NIR would be satisfied." That is:

> By KEW assigning exactly 100% of "the positive difference, if any, between all presently existing burdens against each of the Leases and twenty five percent (25%)," the buyer would receive exactly the Designated NRI for every Lease.

However, we do not agree with KWF's underlying premise that Exhibit B "state[s] unequivocally" or "require[s]" that the overriding royalty interest assigned by KEW must be "100% of 'the positive difference, if any, between all presently existing burdens . . . and twenty five percent."

Exhibit B does not expressly state that 100% of the assignable interest must be assigned. Instead, Exhibit B reads as follows:

KEW DRILLING (the "Assignor"), a limited partnership whose address is 4925 Greenville Avenue, Suite 500, Dallas, Texas 75206, for and in consideration of $10.00 and other good and valuable consideration, in hand paid by the parties hereinafter identified as the "Assignees" (the "Assignees"), the receipt and sufficiency of which consideration is hereby acknowledged and confessed by Assignor, has SOLD, ASSIGNED and CONVEYED, and by these presents does hereby SELL, ASSIGN and CONVEY to Assignees in the proportions set forth below opposite the name of each Assignee, an overriding royalty interest in and to all oil, gas and other liquid or vaporous hydrocarbons, produced, saved and sold from each of the oil and gas leases (collectively, the "Leases" and each a "Lease") described in the attached Exhibit "A", equal to, the positive difference, if any, between all presently existing burdens against each of the Leases and twenty five percent (25%) of the oil, gas and other liquid or vaporous hydrocarbons produced, saved and sold from such Lease, subject to the terms, limitations and other provisions set forth herein.

| Names and Addresses of Assignees | Percentage Interests Assigned to Assignees |
|---|---|
| | |
| TOTAL | 100% |

If we understand its argument correctly, KEW contends that because Exhibit B's fill-in-the-blank section ends with "TOTAL 100%," the corresponding contract, by incorporating the exhibit, thus effectively contains a requirement that 100% of the interest available to be assigned under Section 8.1(iii) must be assigned, and if less than 100% is assigned, the assignment is defective. But KWF cites no authority in support of this proposition.

We find an analog to Exhibit B in the Texas Pattern Jury Charge 4.3 Proportionate Responsibility, which contains a similar fill-in-the-blank section ending with "Total 100%" :

13

If you answered "Yes" to Question[*s*] _____ [*applicable liability question(s)*] for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found caused or contributed to cause the [*injury*] [*occurrence*]. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

QUESTION _____

For each person you found caused or contributed to cause the [*injury*] [*occurrence*], find the percentage of responsibility attributable to each:

| | | |
|---|---|---|
| 1. | *Don Davis* | _____% |
| 2. | *Paul Payne* | _____% |
| 3. | *Sam Settlor* | _____% |
| 4. | *Responsible Ray* | _____% |
| Total | | 100 % |

State Bar of Tex., Texas Pattern Jury Charges—General Negligence, PJC 4.3 (2022).

Notably, though, unlike Section 8.1(iii), to ensure readers understand a requirement that the percentage totals must equal 100 percent, PJC 4.3 expressly instructs the jury with clear language to that effect: "The percentages you find must total 100 percent." *Id*. That is, PJC 4.3's drafters did not simply expect a fill-in-the-blank section ending with "Total 100%" to convey a requirement that 100% responsibility must be allocated, rather than 100% being a ceiling or suggestion. Similarly, we do not believe "Total 100%" is equivalent to stating that 100% of an allocable item must be allocated.

Because we thus construe the sales contracts to require neither that KEW assign any amount of overriding royalty interest nor that any such interests assigned must comprise 100% of the allocable amount, we conclude that the post-closing corrected assignments executed by KEW and KWF are invalid and unenforceable. As a result, we need not reach Callon's issues regarding its asserted bona-fide-purchaser status.

14

## V. CONCLUSION

We reverse the trial court's order granting KWF's motion for partial summary judgment and the trial court's final judgment in their entirety, and render judgment that Appellees take nothing on their claims. The award of attorney's fees to Appellees in the trial court is vacated, and Appellees' request for attorney's fees in this Court is denied.[6]

LISA J. SOTO, Justice

January 28, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

---

[6] While Callon's prayer refers to (1) unspecified counterclaims and (2) attorney's fees under Texas Civil Practice and Remedies Code Chapter 37, neither side addresses either matter in its briefing. Accordingly, we likewise do not address these matters. *See* Tex. R. App. P. 38.1(i) and 38.2(a)(1) (briefs must contain clear and concise argument for contentions made, with appropriate citations to authorities and the record).