# Supreme Court of Texas

No. 20-0904

Devon Energy Production Company, L.P., f/k/a GeoSouthern DeWitt Properties, LLC, BPX Properties (NA) LP, GeoSouthern Energy Corporation, and BPX Production Company,

*Petitioners*,

v.

Michael A. Sheppard, et al.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

JUSTICE BLACKLOCK, dissenting.

This Court recently observed that "allowing the holder of an 'at the well' royalty to escape his responsibility for post-production costs would improperly convert the royalty interest from a royalty on raw products at the well to a royalty on refined, downstream products." *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 392 (Tex. 2021) (quoting *Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 205 (Tex. 2019)). In my view, the Court's decision today commits a similar error. It allows the holder of a "gross proceeds"

royalty to convert his interest from a royalty on the products at the point of initial sale into a royalty on more fully refined products sold by third parties at a downstream market center. The parties' agreement, as I understand it, does not support this outcome. I therefore respectfully dissent.

The most relevant portions of the parties' agreements are Paragraph 3 of the Lease and Addendum L. There is no dispute that Paragraphs 3(a) and 3(b) establish a conventional "gross proceeds" royalty, under which "the royalty is to be based on the gross price received by [the lessee]." *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 136 (Tex. 1996). "When proceeds are valued in 'gross,' . . . the valuation point is necessarily the point of sale because that is where the gross is realized or received." *BlueStone*, 620 S.W.3d at 391.

There is also no dispute, at least in this Court, that Devon Energy paid the royalties described by Paragraphs 3(a) and 3(b), which are "gross proceeds" royalties calculated based on Devon's proceeds from its initial sale of products to a third party. The royalty holders nevertheless claim that Paragraph 3(c) of the Lease, combined with Addendum L, overrides the "gross proceeds" royalty and obligates Devon to pay royalties based on downstream prices at market centers rather than based on Devon's gross proceeds. The Court agrees, relying heavily on Paragraph 3(c), which provides:

> If any disposition, contract or sale of oil or gas shall include any reduction or charge for the expenses or costs of production, treatment, transportation, manufacturing, process or marketing of the oil or gas, then such deduction, expense or cost shall be added to the market value or gross proceeds so that Lessor's royalty shall never be chargeable

2

directly or indirectly with any costs or expenses other than its pro rata share of severance or production taxes.

Paragraph 3(c) cannot bear the weight the Court puts on it. Rather than read Paragraph 3(c) to altogether change the nature of the "gross proceeds" royalty created by the previous two paragraphs, I understand Paragraph 3(c) (and Addendum L) as an attempt to ensure that neither a clever lessee nor a wayward court will deprive the royalty holder of the full benefit of its cost-free "gross proceeds" royalty.

Paragraphs 3(a) and 3(b) provide essential context for what follows. Under the applicable portions of Paragraph 3(a), the oil royalties are calculated based on the "market value" of the oil produced, "such value to be determined by . . . the gross proceeds of the sale thereof." The gas royalties are likewise calculated based on "the gross proceeds realized from the sale of such gas." In either case, the royalty holder is entitled to a 1/5 share of whatever value the product has at the point of its initial sale by Devon. That value is determined based on the "gross proceeds" of Devon's initial sale, 1/5 of which belongs to the royalty holder.

With such a royalty—on the value of the product at its point of initial sale by Devon—already established, the agreement proceeds to Paragraph 3(c). That provision only applies "[i]f any disposition, contract or sale of oil or gas shall include any reduction or charge for the expenses or costs of production . . . ." So the first question is whether the sales at issue in this appeal included any such "reduction or charge." They did not. The sales at issue are Devon's initial sales to third parties, and these sales contained no "reduction or charge for the expenses or costs of production." They were arms-length transactions, and the buyer

3

paid a freely agreed price that reflected the value of the product at the point of sale. Nothing was "reduced" or "charged" from that amount "for the expenses or costs of production." In determining the price for these sales, Devon did not identify a market price for the products in their current form and then subtract a "reduction" or a "charge" for already-incurred production expenses. Instead, it sold the products in their current form for a price the market would bear for such products, and it paid the royalty holders 1/5 of that price. This transaction involved no "reduction" or "charge" for production costs that reduced either the proceeds received by Devon or the royalty received by the royalty holders.

The confusion arises only because of how the price Devon charged was calculated. To identify a fair price for products that were not yet ready for market, Devon and its counterparty subtracted estimated future production costs from the published "market-center" prices for more refined products. The result of this formula yields the market value of the products at their point of initial sale, or so the parties to the sale agreed. The royalty holders are then entitled to 1/5 of *that value*, with no reduction for production costs, which is what Devon paid.

The royalty holders and the Court, however, seize on Devon's *method of calculating* the value of the products at their point of initial sale. They view the subtraction of future costs from the market-center price as the "reduction" or "charge" envisioned by Paragraph 3(c). This misperceives what is happening. The royalty is on the value of the production at the point it is first sold. The market-center price only came into the picture as a mechanism for calculating the value in which

4

the royalty holders share. Nothing in the agreements entitles the royalty holder to receive a royalty based on the market-center price just because Devon happened to use that price as a way to calculate the product's value at its point of initial sale. It is only that value—at the point of initial sale—in which the royalty holder shares under these agreements.

The strange result of the Court's approach is that the royalty owed depends not on the value of the products at their point of initial sale, but on how Devon calculates that value. Under the Court's decision, if Devon had charged $100 at its initial sale without explaining how it got that number, the royalty holders would get $20. But if the sale documents show that the $100 price was calculated by taking a $120 market-center price and subtracting $20 in estimated post-sale production costs, then the royalty holders get $24 (1/5 of $120). In both cases, the market value of the thing sold and the gross proceeds from the initial sale are identical. The only difference is the method of calculating the sale price. Actually, as the Court sees it, the difference in royalty depends not even on the method of calculating the sale price but on whether that method is reflected in the sale documents.

None of this confusing arrangement—where the royalty fluctuates based on the happenstance of paperwork instead of based on the market value of the product or the gross proceeds from its sale—is required by the text of the parties' agreement. The parties certainly could have written Paragraph 3(c) to create a royalty based on market-center prices or based on price-calculation paperwork. They did not, and the best evidence that they did not intend Paragraph 3(c) to

5

accomplish this result is the words they used in Paragraph 3(c), which explicitly tell us what it is trying to accomplish. The reason "any reduction or charge" must be added to gross proceeds, according to Paragraph 3(c), is "so that Lessor's royalty shall never be chargeable directly or indirectly with any costs or expenses . . . ."

When the royalty is on unrefined or partially refined products at the point of initial sale—as this one is—then simply paying 1/5 of the gross proceeds, as Devon did, in no way renders the royalty "chargeable directly or indirectly with any costs or expenses." The royalty holder is not paying for post-sale production costs. Neither is the producer. Someone else will pay those costs later. The royalty holder naturally receives less payment because such costs are yet to be incurred, but that is only because he has a royalty on the less valuable products at their point of initial sale. He does not have a royalty on further refined products at the market center, so he has not been "charged" anything by Devon's refusal to pay him such a royalty. Nor has his royalty suffered a "reduction" just because Devon happened to price its initial sale with reference to market-center prices.

Addendum L[1] likewise tells us what it means to accomplish. The royalty holders sought to ensure that "this paragraph shall not be

---

[1] Addendum L states:

Payments of royalty under the terms of this lease shall never bear or be charged with, either directly or indirectly, any part of the costs or expenses of production, gathering, dehydration, compression, transportation, manufacturing, processing, treating, post-production expenses, marketing or otherwise making the oil or gas ready for sale or use, nor any costs of construction, operation or depreciation of any plant or other

treated as surplusage despite the holding in the cases styled '*Heritage Resources, Inc. v. NationsBank*', 939 S.W.2d 118 (Tex. 1996) and '*Judice v. Mewbourne Oil Co.*', 939 S.W.2d 135–36 (Tex. 1996)" (cleaned up). In both of those cases, the Court required the holders of an "at the well" royalty to bear post-production costs, despite potentially contrary language in the agreement, because an "at the well" royalty is an interest in unrefined products. *Heritage Res.*, 939 S.W.2d at 122–23; *Judice*, 939 S.W.2d at 135.

Addendum L is an attempt to prevent courts from reaching a similar result in this case by treating this royalty as an "at the well" royalty that bears post-production costs. The Addendum emphasizes the "gross proceeds," production-cost-free nature of the royalty and disclaims any similarity to agreements that prior courts had found insufficient to create a cost-free royalty. The Addendum does not transform the royalty from a "gross proceeds" royalty on partially refined products at their point of initial sale into a royalty on further refined products at a market center. Again, simply paying the royalty holder 1/5 of the gross proceeds from the initial sale—as the agreement calls for and as Devon did—does not "charge" the royalty holder with any future costs of production.

---

facilities for processing or treating said oil or gas. Anything to the contrary herein notwithstanding, it is expressly provided that the terms of this paragraph shall be controlling over the provisions of Paragraph 3 of this lease to the contrary and this paragraph shall not be treated as surplusage despite the holding in the cases styled "Heritage Resources, Inc. v. NationsBank", 939 S.W. 2d 118 (Tex. 1996) and "Judice v. Mewbourne Oil Co.", 939 S.W. 2d 135-36 (Tex. 1996).

Neither Paragraph 3(c) nor Addendum L is purposeless under my reading. Both prevent Devon from using accounting gimmicks—such as shifting pre-sale production costs to an affiliated third party—to reduce the gross proceeds it receives for its initial sale and thereby to reduce the royalty payment. These provisions do not, however, authorize the royalty holder to use accounting gimmicks against Devon, which is what happens when Devon is required to pay an inflated royalty just because it left behind a paper trail indicating that it calculated its initial sales price with reference to downstream market-center prices.

In its desire to vindicate the agreement's prohibition on "indirect" cost-shifting, the Court ends up fundamentally changing the nature of this royalty based on tenuous textual cues that are themselves indirect at best. The reading of the agreement proffered by Devon harmonizes Paragraph 3(c) and Addendum L with the "gross proceeds" royalty created by Paragraphs 3(a) and 3(b). The result is a rational "gross proceeds" royalty arrangement that is firmly tethered to the value of the products at their point of sale and does not fluctuate depending on administrative vagaries that have nothing to do with the value of the products themselves. This is, to my mind, the superior reading of an admittedly difficult agreement. Because the Court concludes otherwise, I respectfully dissent.

James D. Blacklock
Justice

**OPINION FILED:** March 10, 2023

8