# Supreme Court of Texas

No. 24-0425

Equinor Energy LP,

*Petitioner*,

v.

Lindale Pipeline, LLC,

*Respondent*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued October 9, 2025**

JUSTICE SULLIVAN delivered the opinion of the Court.

Did Equinor Energy LP breach a contract with its water supplier and pumper, Lindale Pipeline, LLC, by purchasing water from other suppliers for use in fracking its oil wells?  The answer is *no* because the oil wells sit outside the scope of the contract's exclusivity clause.  We therefore reverse and render judgment for Equinor.

**I**

Fracking is a thriving industry in the United States. Short for "hydraulic fracturing," it involves pumping water "down [a] well and into a formation under pressure high enough to cause the formation to crack open, forming passages through which oil or gas can flow into the wellbore." 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* 414 (Patrick H. Martin & Bruce M. Kramer, eds. 2024). Fracking requires large amounts of water, so fracking companies often contract with water suppliers to transport water to well sites.

In the early days of fracking, the normal practice was to transport water to well sites by truck. But in 2000, Dale Behan developed a way to transport water directly to well sites via pipelines. For the next decade, he ran a company that built these pipelines in Texas.

Around 2009, Behan's company expanded its business to North Dakota and began providing water to Equinor's predecessor for fracking operations there. Behan and Equinor's predecessor agreed that laying an underground pipeline would be more efficient than trucking in the water. So Behan formed a new company, Lindale, which contracted with Equinor's predecessor to supply water through the new pipeline in North Dakota. Under the contract, Equinor's predecessor would finance the pipeline's construction and take ownership of the pipeline once constructed. In exchange, Lindale agreed to serve as the exclusive water supplier "on the Pipeline" and to charge below-market rates for the water.

Relevant here, Section 4 of the contract provides in relevant part that "Lindale shall be the sole and exclusive water provider and pumper on the Pipeline; however, in the unlikely event that Lindale is unable to

2

provide water through the Pipeline for [Equinor], [Equinor] may then use other water sources or pumpers on the Pipeline." The contract defines "Pipeline" as the "freshwater pipeline, lateral lines, related facilities, well-site appurtenances, rights-of-way, easements, and permits owned by [Equinor] as of the date of this Agreement, including without limitation, those described and shown on [the map] attached hereto."

A few years after the parties executed the contract, Equinor acquired the predecessor company that'd signed the contract with Lindale. In the meantime, a new water-transportation technology had emerged: lay-flat hoses. As the name suggests, lay-flat hoses are similar to large fire hoses that lay on the ground. They're cheaper to use than underground pipelines, so Equinor began purchasing its water from other suppliers that used the new technology—this instead of purchasing its water from Lindale.

Lindale sued Equinor for breach of contract, arguing that Section 4 gave Lindale the *exclusive* right to supply water for Equinor's fracking operations. Equinor responded that the oil wells for which it bought outside water were not "on the Pipeline" and thus were outside the scope of Section 4's exclusivity clause. The district court deemed Section 4 ambiguous and submitted the question of its meaning to a jury. The jury sided with Lindale and awarded it $26 million in damages. On appeal, Equinor argued that it didn't breach the exclusivity clause and that the damages award was excessive in any event. The court of appeals disagreed with Equinor on both issues and affirmed. We granted Equinor's petition for review.

3

**II**

This case turns on whether Equinor's wells are "on the Pipeline" such that they fall within the scope of Section 4's exclusivity clause.[*] If a contract is ambiguous, its meaning is a question of fact for a jury to decide, and "extraneous evidence may be admitted to help determine the language's meaning." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019). But if a contract is unambiguous, its meaning is a question of law that we review de novo. *Id.* at 479; *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763–64 (Tex. 2018). In doing so, we "interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *URI, Inc.*, 543 S.W.3d at 764 (internal quotation marks omitted). Although we've said that our primary goal in contract construction is to "ascertain the true intentions of the parties," *e.g.*, *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011), this "intent" is a bit of a legal fiction. We're really looking for something objective, not subjective—hence our careful attention to the text of the contract itself.

Assuming for argument's sake that this is a requirements contract, Equinor could've breached the contract only if the water it purchased fell within the scope of Section 4. The contract, after all, only made Lindale "the sole and exclusive water provider and pumper on the

---

[*] The parties also dispute whether Section 4 creates a "requirements contract." The question of what language creates a requirements contract, as opposed to an ordinary supply contract, is a complicated one. We haven't opined on this issue in over 70 years, *see Pace Corp. v. Jackson*, 284 S.W.2d 340, 344–46 (Tex. 1955), and have no occasion to do so today. Even if Lindale is right about Section 4 creating a requirements contract, Lindale would still have to show that the water sales at issue were within Section 4's scope.

4

Pipeline." The contract defines the "Pipeline" as the "freshwater pipeline, lateral lines, related facilities, well-site appurtenances, rights-of-way, easements, and permits owned by [Equinor]." Equinor notes that the wells themselves aren't on this list and argues that, as a result, the exclusivity clause doesn't apply to water bought for the wells and transported through pipes (or lay-flat hoses) other than the Pipeline.

## A

As always, we turn to the text. Section 4 is divided into two clauses: an exclusivity clause and an exception clause. The exclusivity clause makes Lindale "the sole and exclusive provider and pumper on the Pipeline." The exception clause allows Equinor to "use other water sources or pumpers on the Pipeline" only "in the unlikely event that Lindale is unable to provide water through the Pipeline for [Equinor]."

Our principal task is to divine the meaning of the phrase "on the Pipeline," which is used in both clauses. The parties primarily dispute the meaning of the word "on" because that meaning determines whether Lindale is the exclusive supplier of water that flows *through* the Pipeline, or the exclusive supplier for wells that are *attached to* the Pipeline. Equinor advocates the first view, arguing that "on" indicates a means of conveyance. On this reading, "on" would most nearly mean "for" or perhaps "of," such that Lindale is the provider for only the *Pipeline*—not for the lay-flat hoses that don't connect to the Pipeline. Lindale counters that "on" means "next to." On this view, the wells are "on" the Pipeline because they're attached to it.

Both parties plausibly invoke dictionary definitions of "on" that support their respective views. Turning first to dictionaries, the big boys

5

agree that "on" has many meanings. The primary meaning is to indicate that one thing is *atop* another thing. *See, e.g.*, *On, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020). But as both parties agree, that's not what "on" means here. *Merriam-Webster's Collegiate Dictionary* notes that "on" can indicate either a "position in close proximity with" or a "means of conveyance." *Id.* *The Oxford English Dictionary* likewise notes that "on" can mean either "[i]n proximity to; close to" or "[w]ithin the limits or bounds of." *On, The Oxford English Dictionary* (2d ed. 1989). In other words, dictionaries support both parties' views.

Moving on from the dictionaries, then, we find some clues in sentence structure. The prepositional phrase "on the Pipeline" modifies the nouns "provider" and "pumper." This is inconsistent with Lindale's argument that the wells are "on the Pipeline" simply because they're connected to it. To adopt that logic, we'd have to read into the exclusivity clause an additional noun such as "oil wells," "drilling," or "operations" for the prepositional phrase to then modify. On that view, the exclusivity clause would read: Lindale is the "exclusive water provider and pumper [for oil wells] on the Pipeline." We decline this latest invitation to blue-pencil words into the contract. *See Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 714 S.W.3d 572, 574 (Tex. 2025).

Turning to the exception clause, we note that it uses the word "through" somewhat synonymously with the word "on." The clause states that if "Lindale is unable to provide water *through* the Pipeline," then Equinor may "use other water sources or pumpers *on* the Pipeline." In other words, the function of a pumper "*on* the Pipeline" is to get "water *through* the Pipeline," not to pump water into conduits *next to* the Pipeline.

6

The contract's definition of "Pipeline" doesn't change this conclusion. The "Pipeline" is defined as the "freshwater pipeline, lateral lines, related facilities, well-site appurtenances, rights-of-way, easements, and permits owned by [Equinor] as of the date of this Agreement, including without limitation, those described and shown on [the map] attached hereto." The Pipeline thus consists of the enumerated components that are "described and shown on" a map attached as an exhibit to the contract. That map shows not only the lateral lines, well-site appurtenances, and other enumerated components of the Pipeline, but also the then-existing oil wells. Lindale argues that, as a result, the exclusivity clause incorporates the map—and hence the oil wells—by reference.

An attached exhibit may provide relevant context for interpreting the contract's text. *See Occidental Permian, Ltd. v. Citation 2002 Inv. LLC*, 689 S.W.3d 899, 905 (Tex. 2024). And where that exhibit is expressly incorporated by reference, it becomes a valid and enforceable part of the contract. *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006).

That said, the map spread before us doesn't make the oil wells part of the Pipeline. The contract incorporates the map by defining the Pipeline to include the enumerated components "described and shown on [the map] attached hereto." By the contract's plain terms, the map only *describes* the enumerated components of the Pipeline; it doesn't purport to *expand* that list. And given that the oil wells aren't on the list, it's immaterial that the map depicts them. After all, an exhibit is enforceable as part of a contract only to the extent it's incorporated by reference—that is, the incorporation language determines the exhibit's effect. And here, that effect was only a visual description.

We conclude that, under the plain text of the contract, the oil wells are outside the scope of the exclusivity clause. As such, Equinor was free to purchase water for the wells from third parties without breaching Section 4 of its contract with Lindale.

**B**

Because the contract's text is unambiguous, we need not—and should not—go any further. We therefore reject Lindale's purposivist arguments about what it wishes had been written in the contract it signed.

*First*, Lindale improperly relies on a statement of purpose in the contract to distort its terms. The introductory section states that the purpose of the Pipeline is "to provide water for drilling, completion and production operations." Lindale argues that this purpose requires providing water to the wells themselves, not just to the enumerated components of the Pipeline. That may be true, but we'd care about the purpose of the contract only if Section 4 were ambiguous. It's not, so we don't.

Relatedly, Equinor objects to the district court's decision to allow testimony about the parties' course of performance (specifically, that Equinor had bought water for its wells from Lindale for the first several years of the contract's term). Equinor is correct that courts can't consider course-of-performance evidence to interpret an unambiguous contract. *Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019). But the problem isn't that the district court allowed the jury to hear improper evidence—it's that the court allowed the jury to interpret an unambiguous contract at all.

Ironically, Equinor also points to extrinsic evidence of usage to argue that the wells aren't on the Pipeline. At oral argument, Equinor

8

noted that a third-party company pumps the water from the pumphouse down into the wells to fracture the shale. So Lindale only pumps the water until it gets to the well site (that is, the surface of the ground surrounding the well), at which point another company pumps the water from the surface down into the well. We decline to consider any extrinsic evidence of usage, regardless of which party offers it.

*Second*, Lindale argues that it wouldn't have agreed to the contract if the exclusivity clause didn't include the water used for the wells themselves. Lindale also argues in its brief that excluding the wells from the definition of the Pipeline would be "inequitable" because the contract "required Lindale make a $1.2 million initial capital investment to make the Pipeline operable and then continue to pay to maintain the Pipeline, all while providing below-market pricing to Equinor."

Lindale points us to loose language from our opinion in *Frost National Bank v. L&F Distributors, Ltd.*, where we said that we "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." 165 S.W.3d 310, 312 (Tex. 2005) (per curiam) (internal quotation marks omitted). But we think Lindale takes *Frost National Bank* too far. We do indeed interpret words according to how an ordinary user of the English language would understand them, and doing so does entail concepts like reasonability and the presumption against absurdity. But we have no business rescuing parties from contracts that turned out to be bad deals in the name of utilitarianism or equity. Our job is to read the words chosen by the contracting parties.

"As we have said time and again, courts may not rewrite a contract under the guise of interpretation." *Sundown Energy LP v. HJSA No. 3, L.P.*, 622 S.W.3d 884, 889 (Tex. 2021) (per curiam).

Perhaps Lindale understood the contract to make it the exclusive provider of water to the wells, not just of water on the Pipeline. But the contract didn't say that. We've repeatedly emphasized that the "principle of freedom of contract requires us to recognize that sophisticated parties have broad latitude in defining the terms of their business relationship, and courts are obliged to enforce the parties' bargain according to its terms." *Id.* (internal quotation marks omitted). If Lindale wanted the exclusive right to provide water to the wells, then it was perfectly free to refuse the contract as drafted and to propose alternative language. *But cf. The Godfather* (Paramount Pictures 1972) (describing offers that, unlike the one here, can't be refused).

### III

We hold that, as a matter of law, Equinor didn't breach its contract with Lindale. Because the interpretation of an unambiguous contract is a question of law, the district court erred in submitting that question to the jury. That dispositive error makes it unnecessary to consider damages. We reverse the judgment of the court of appeals and render judgment for Equinor.

James P. Sullivan
Justice

**OPINION DELIVERED:** March 13, 2026

10